Good morning, Your Honors. Jason Carr on behalf of Petitioner Appellant Redeker. The issue in this case, well, there are many fold issues, but the primary issue is the Nevada Supreme Court's opinion that Redeker was not in custody at the time of the pre and midstream Miranda warnings, six hours approximately after being first seized by law enforcement, whether he was in custody at that particular time. And our position is the Nevada Supreme Court's opinion, which is pertinent parts on pages 38 through 42 of the excerpt of record, that that opinion is not entitled to ad pedeference for two reasons. One, it is based on a clearly erroneous finding of fact, and this is probably our strongest argument, because the Nevada Supreme Court says that after Mr. Redeker was handcuffed, he was initially handcuffed on the scene at approximately 1015 that evening PM. The handcuffs are taken off him so we can sign a consent to search for him a half hour later. The Nevada Supreme Court says that after the handcuffs are taken off, there's no further evidence that Mr. Redeker was in custody. And that finding is clearly erroneous. So you have to show more than it's clearly erroneous, don't you? You have to show it's unreasonable. Well, under the D2 analysis, which is distinct from the D1, we would have to show that the factual finding was clearly erroneous based on the state court record, which we can do here and under Taylor-B. Maddox, and also that that factual finding was pertinent to the Nevada Supreme Court's opinion. That's the legal formulation. OK, so why was it clearly erroneous? It's clearly erroneous because the Nevada Supreme Court says there's no evidence. It says no evidence that Mr. Redeker was in custody after the handcuffs were taken off. That record in this case, beginning with the testimony of Officer Jensen, who was one of the first on the scene, which begins on 441 of the excerpts of record, Jensen says that, first of all, repeatedly, both him and Officer Burnett, and later Detective Jackson, state that Mr. Redeker was not, in fact, free to leave. Jensen and Burnett testify that for the next five hours until at least 245 in the morning, it's a little unclear what happens after that, that they had him under their eye the entire time. He was never allowed to leave the presence of their eyes. That he was made to stay in the front yard of the area. That Mr. Redeker made repeated requests to go inside the house. He made repeated requests to get medicine. He made repeated requests for food and water. Now the government makes a big deal of the fact that maybe Mr. Redeker was allowed to eat McDonald's some undetermined time later. I will note that Jensen and Burnett said, specifically, the two officers who were in charge of supervising Mr. Redeker for a five and a half hour period, that they did not give him a chair. They did not allow him to have water. They did not allow him to have food. Now it's not that important, because as even my client mentioned to me, they could have been serving him a full seven-course banquet there on his front lawn, and he still would have been in custody. I mean, the fact that he was able to eat food. Counsel, if we agree with you that there was a Miranda violation, why wasn't any error harmless due to the post-Miranda statements? Well, that's an excellent question. Once again, Ed Pedefrans would not apply here, because the Nevada Supreme Court specifically said, because we find he wasn't in custody during the pre-Miranda setting, that we are not going to apply the Seaboard or Oregon v. Elstead analysis. So there's no adjudication of the merits on that decision. But even on de novo review, even if we agree with you on that, why wouldn't the post-Miranda statements cure any harm? If you look at even the opinion in Oregon v. Elstead, which was the primary opinion argued to the Nevada Supreme Court, but which Miranda v. Seaboard, of course, plays off of. In Oregon v. Elstead, what the Supreme Court found significant there was that the pre-Miranda warnings were not, before the midstream Miranda giving, were not in any way coerced and completely voluntary. There is a lot, and I don't want to overstate things, but there is a lot of evidence in here that these statements were not voluntary. If you look at the recorded, now, we know that Mr. Redeker was interrogated for 30 to 40 minutes by Jensen and Burnett, directly confronted with evidence of guilt that they found in the search of his home. But that's not recorded. We don't know exactly how combative. Well, counsel, just precisely when do you contend he was in custody? I mean, after all, he voluntarily went to the police station. He was uncuffed. He rode in the police car. At his house, he was uncuffed and allowed to smoke. He was never told he could, he had to talk or could not leave. First of all, this is after being in police custody for six hours. Now, the government- No, in other words, you agree he wasn't in custody until he was at the station? Is that what you're saying? No, he was in custody the moment he was ordered to exit his car and handcuffs were put on him. At no time after that would any reasonable person have felt like he was free to leave. The facts that the government rely on the most are the facts that he was allowed to wander around his front yard, which is a very small front yard. But that, OK, so take Redeker and put him in a room. So he was made to stay in a room for six hours at relatively cold temperatures, about 60 to 55 degrees that night. He's in a t-shirt and a short-sleeved polo shirt, not allowed to eat. He's not allowed to sleep. He's not allowed to get his medication. He's not allowed in his house. He's in a completely police-dominated atmosphere under supervision. Did he ask to leave? Did he ask for medication and all of that? Yes, he did. And it's directly, we have direct evidence of that in the Jackson interview, which was recorded. And you can find it beginning on the record at page 1012 through about 1047. And you'll note in that interview, and I would interview, that although Jackson starts off nicely, it becomes, as the trial court found, and note that the trial court found that he was, in fact, in custody at this time and suppressed the statements because of that, that he hammers him. I mean, it is all the hallmarks that this court looks at for whether somebody's in custody, whether it's a custodial interrogation, confronted with evidence of guilt. Redeker, at least 50 times, tries to not say anything, tries to remain silent. I mean, over and over again, no response. He says, I need help. I'm tired. I'm tired of talking. There's evidence in this record that is just replete with indications that Redeker did not want to speak to law enforcement, that he was distressed, that he was, basically, his will was overborne. And so the Nevada Supreme Court and the district court, in this case, to some extent, they want to take this period of time when Detective Marmon and Sherwood show up at about 345 in the morning after Redeker's been in complete police-dominated custody up until then, and just focus in at that time, and say, oh, well, because even though Detective Hardy never said, free to leave, he said, come with me to the station. And that was an acquiescence. It wasn't an acquiescence. It was a bow to the overwhelming police authority and show of authority. And how do we know that? For many reasons. But one of the reasons is, many times, Redeker indicated a strong intent to no longer engage in talking, engage in interrogation. And law enforcement never relented, never read him his rights, never let him leave. And I will note, under Craighead, which, incidentally, this court was actually cited to the Nevada Supreme Court during the oral argument in this case. And the oral argument is in the record. Under Craighead, the fact that he's in his front yard under this police-dominated atmosphere all factors in to a finding that he was, in fact, in custody. And what's interesting about the district court's opinion in Nevada Supreme Court. Weren't they going through the house at the time? Yes, they were. Isn't that just good police practice, to keep the occupants of the house there while they go through the house? Nobody says there's anything wrong with that. There's nothing wrong with that at all. What is wrong is when somebody is in custody and subject to interrogation, you have to read them their rights. That was the fault here. Nobody, we aren't saying, although the original protective service was challenged below, that's no longer an issue here. We're not saying that there's anything wrong with the police procedures. We're just saying in this court's. I thought you were arguing that he had been in custody, been detained or in custody for five hours before he went to the police station. Yes, he was. That's the reality of the situation. And I note, under Nevada law, under Nevada statute, the Nevada Supreme Court opinion says it. The dissent, and I know I would direct this court's attention to the Nevada Supreme Court dissent in this case, which is highly detailed, and also strongly supports my argument that the majority opinion was wrong in saying there was no factors regarding Mr. Redeker was in custody, because the dissent lays it all out in great detail. And it is not contrary to the majority decision, other than that key point, because the majority decision doesn't get into the facts of the case at all or make any factual findings about the case. I see I only have 30 seconds left, so. All right, we'll give you a minute for rebuttal. Thank you, counsel. Hello, Your Honors. Heidi Stern for respondents. It's our position that Redeker was definitely not in custody during the Hardy interrogation at the police station. That was Detective Hardy, who was a homicide detective. This court considers various standards in order to determine this. This court considers the language used to summon here. There was a question as to whether Redeker would voluntarily go with Detective Hardy. The other question is whether Redeker was confronted with his guilt. Hardy did not do that until after issuing a Miranda warning. The physical surroundings in this case, I think, actually argue in favor of Redeker not being in custody, because he was removed from the situation where he'd been at in front of his home and voluntarily in the front seat of the police car traveled to the police station unrestrained and was given a drink at that point. And even though the room was small and there were two detectives there in the room, he was told he was free to leave. He was told he was not under arrest. So counsel, it's your position that an interrogation room in a police station is less coercive than a person's home? Not usually, Your Honor. In this case, I think it was at least equally non-coercive, I would say, because you have to consider whether a reasonable person would expect they're free to leave. If you're in a police station and you're told you're free to leave, you're told you're not under arrest, you're not restrained in any way, the door's not locked on you, and you're given a soda, I think the objectively reasonable person would expect that they could end that discussion and go elsewhere. So in this case, that is the situation. The other question that this court looks at is the degree of pressure placed upon Redeker. Again, no coercive questions or questions about guilt were asked by Hardy before the Miranda warning was given. Redeker's confession pre-Miranda warning was spontaneously and voluntarily given. And the last factor is the duration. And again, this questioning by Hardy was quite separate from what had gone on before. We would urge this court not to find that there was a custodial relationship going on here for six hours. Basically, Redeker was hanging out in front of his home, even though, and let me address right now the argument made by opposing counsel that the Nevada Supreme Court erred in finding there was no evidence that Redeker was free to leave. Because what happened at the police station or at the home? The home. I'm kind of going back to the home because I would urge this court not to consider this as a six-hour long interrogation and a custodial relationship. Redeker, when he was at his home, the only evidence that he was actually not free to leave was the subjective opinions of the police officers, which came in later. So in fact, the Nevada Supreme Court was correct in finding there was no objective evidence that he wasn't free to leave. He was sitting in front of his home. He did have food. When the officers said that they didn't give him any food, it was simply that they were not taking responsibility for him. And in fact, Jensen testified at trial that there were large blocks of time in which no one was really paying attention to Redeker and he was left unattended. When Hardy arrived, Hardy testified that Redeker was not attended by any police officers, that there were only a couple of police officers even at the home, and they were not the ones who had done the initial investigative search. They were different ones. Hardy's questioning was not connected in any way to Jackson's or to officers Jensen and Burnett. He didn't even know about that questioning when he arrived. So coming back to the relevance of that, the duration of Hardy's questioning was short, less than an hour. In fact, just a few minutes really at the police station before Redeker voluntarily confessed to the crime. And to Hardy's credit, as soon as Redeker did that, he issued a Miranda warning. And Redeker, who was, we'll point out, an intelligent person. He had a college degree. He had a reasonably good job. He voluntarily and intelligently said that he knew about his Miranda rights. He understood what they entailed. And he still did continue after that warning to voluntarily give his confession. Counsel, this is rather unusual to see a 23-page dissent out of the Nevada Supreme Court. Do you have any comment on that? I do. And mostly what the dissent in the Nevada Supreme Court found was that this was one long six-hour continuous detention. And I think the only way the court was able to do that was to overlook some of the things in the record that separated that detention. So instead of accepting, for example, that when officers Burnett and Jensen handcuffed Redeker, that that was only a 30- to 40-minute investigative stop, that the dissent found that that then connected to Jackson's questioning of Redeker and that Jackson's questioning of Redeker then connected to Hardy's questioning of Redeker. I would draw this court's attention to a couple of things. One is that the dissent really overlooked the fact that there was an investigation going on here. It was a missing persons case. The police officers needed to be there and kept Redeker out of his home, not because they were detaining him, but because they were still searching the home. And if you look through the trial testimony, not only were they searching the home, but they had to call various types of people in the middle of the night to come and take pictures, to come and collect evidence, and do various things like that. So the investigation of his home was a lengthy process. But he was not kept out of his home because he was being detained. He was kept out because his home, via his consent, was being searched. Same issue with the car. The other thing, so the dissent missed that. They didn't accept that. They missed the fact that he wasn't being detained, but rather he had to be kept out of his home because it was an investigation, an ongoing investigation in the home. Instead, they viewed, the dissent viewed, the fact that he was kept out of his home and kept in his front yard, essentially, as a way that he was being detained. But I thought that the dissent was also thought that the situation before he was Mirandized in the police station was a situation where he was under arrest. They did, as well. Yes, that's correct. And if that is supported, if the dissent is right, and if we do de novo review, and we agree with the dissent on that, don't we have to reverse? No, because the Miranda warning cured his pre-warning confession. Are you relying on what he said afterwards? Yes, and actually, that's another error that the dissent made. They didn't apply the ELSTAT analysis, which is when Justice Kennedy tells us that it is common for police officers to question a suspect multiple times, and in different ways, and with different people. And as a result of that being a common and a good police practice, you have to have the ability to keep Miranda open to correction, that when there is an inadvertent confession before a suspect is Mirandized, you have to be able to correct that. And that is, if this court takes that view, Judge Schroeder, then we would argue that the Miranda warning given here was voluntarily accepted and understood by Mr. Redeker. Counsel, did you say that at the police station that Mr. Redeker was told that he was free to go? Yes. And where is that in the record? That is at ER 390. All right, thank you. Did you say 390? 390, yes. Making sure it's not somewhere else, but that is my understanding. Yeah. And finally, I would just say that the Missouri versus Seabirt case is simply not relevant here. And the Nevada Supreme Court did not apply that analysis for a reason. And it's because there's absolutely no evidence of a deliberate strategy here to not Mirandize Mr. Redeker and try to get a conviction. And I'm not going to read the confession out of him. A review of the trial court record and the questioning transcripts reveals that questions pre-Miranda were geared towards finding the missing person. And only after the Miranda warning was given were questions about Mr. Redeker's guilt given to him. And if the court has nothing further, it looks like I'm out of time. I'm trying to look on page 390 to see where there was testimony that he was told he was free to leave. This is testimony, right? Yeah, this should be trial testimony, I believe. Yeah, I'm on page 46 going to page 47. Do you know if the officer told him he had to stay there, he wasn't free to go at that point? No, I did not. Did you ask? No, I didn't talk to the officers. So Mr. Redeker may have been told by the other officers, do not leave. You don't know. I don't know. And he's talking, is that Hardy? He's talking about the previous officers. But in addition, I can find the court the citation from the transcript directly. I don't have that written down because these are the trial citations. But I can find the court that citation from. All right, thank you, counsel. Thank you. Rebuttal. Detective Hardy never told. It was a key issue in this case. No law enforcement ever told Redeker that he was free to leave, including Detective Hardy. It's certainly not anywhere in the evidentiary hearing transcript. But we do know, however, that Jensen and Burnett said many times that he was watched, and extra record, 473 to 74, we watched him the entire time so he wouldn't leave. No, Miranda, not free to leave. 481, clear, not free to leave. 486, could not leave. He asked to go in the house. We would not let him in the house. He asked for water. No chair, didn't eat, page 496. 498, not free to leave. The evidence is pretty overwhelming. See, I'm having trouble understanding why he should be considered in custody when he was told to stay in the front yard while they were searching the house. Because that seemed, we were discussing before, that seemed to be perfectly good police practice to keep anybody who was in the house there while they searched the house. Then he went, they asked him if he would go to the police station with them, and he went. And then he got to the police station. Is this correct? Yes. And he was questioned. Yes. And I'm having trouble, I can understand how we look to what the situation was in the police station, which is what the dissent seems to focus on in the Nevada Supreme Court. But you keep going back to the situation at the house, and I'm not sure how that relates at all to the question of whether or not he was under arrest when he was in the police station in his statement. The question is, when did he leave custody? I mean, I guess the state's argument is that he didn't have his car, didn't have his wallet. He's in a t-shirt and a polo shirt in the middle of the night. Where was he going to go? Is he allowed to wander away from the house? That in the police, at the house. At the house, right. And we know if he had, here's the ironic, if he had tried to wander off, they would have stopped him. He was not free to go. And it's reasonable to assume that an objective person, when involved in a situation where they were not, in fact, free to go, would perceive it as such. And if you have a situation where there's a crime committed at a party, and you put everybody in the party, and you say, stay in the backyard, don't leave, because we've got to search the house and do an investigation, that they're not under arrest. It would be an investigative detention. They would be seized for some Fourth Amendment purposes and such. It would be a seizure because they acquiesced to authority. Does it evolve into a de facto arrest, versus under Nevada law, per se, any seizure that lasts more than 60 minutes is a de facto arrest, which the Nevada Supreme Court, in its opinion, and acknowledged, but never applied in this case. There's no point in this situation where he was ever free to leave. He was detained in pretty stark circumstances. I mean, he was allowed to wander around his front yard in the cold. And when we get to this point where a hardy shows up, his will is broken down. He asked for help so many times. And if you look at the beginning, it's not true, once again, that Hardy never asked him incriminating questions, pre-Miranda. If you look at page 1053, they start getting into it. So tell me what happened between you and Tuck, the decedent, the victim. And then Redeker says, this is 1053, if someone can get me help, which is not the first time you said that, we're here to help you. And he says, oh, I'm just so tired of talking, and so forth. This was not a voluntary statement. We understand your position, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar, United States v. Ng, has been submitted on the briefs. The next case on calendar for argument is United States v. Sciotta. Ahem.
judges: Schroeder, O'scannlain, Rawlinson